## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Benson Hill, Inc., *at al.*, | Case No. 25-10539 (TMH) |
| Debtors.[1] | (Joint Administration Requested) |

## DECLARATION OF DANIEL COSGROVE IN SUPPORT OF
## DEBTORS' CHAPTER 11 PETITIONS AND FIRST
## DAY MOTIONS AND APPLICATIONS

I, Daniel Cosgrove, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury as follows:

1.       I am the Interim Chief Executive Officer of Benson Hill, Inc. ("Benson Hill") and have been designated by the above-captioned debtors and debtors in possession (the "Debtors," or the "Company") to oversee the filing of the Debtors' petitions for relief and to help manage the Debtors during the pendency of their chapter 11 cases (the "Chapter 11 Cases").  I joined Benson Hill in April 2024 as the Chief Administrative Officer and General Counsel and have recently been appointed as the Interim Chief Executive Officer to oversee the Company during the Chapter 11 Cases.  I have significant experience as an agriculture industry executive, with specific expertise in corporate development, licensing, venture and capital market transactions, and intellectual property.  I earned an MBA at the MIT Sloan School of Management, a J.D. at Drake University, and a Bachelor of Science degree in engineering at Iowa State University.

---

[1]       The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Benson Hill Fresh, LLC (0614); Benson Hill Holdings, Inc. (3749); Benson Hill, Inc. (4823); Benson Hill Seeds Holding, Inc. (0288); Benson Hill Seeds, Inc. (4599); BHB Holdings, LLC (5101); Benson Hill ND OldCo, Inc. (0722); DDB Holdings, Inc. (6117); and J&J Southern Farms, Inc. (0735).  The mailing address for each of the Debtors is 1200 Research Blvd, St. Louis, Missouri 63132.

2.      On the date hereof (the "Petition Date"), the Debtors commenced the Chapter 11

Cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code,

11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the

District of Delaware (the "Court").  The Debtors continue to operate their business and manage

their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.  No party has requested the appointment of a trustee or an examiner.  Concurrently herewith,

the Debtors have filed a motion seeking joint administration of the Chapter 11 Cases pursuant to

Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

3.      I submit this declaration to provide an overview of the Debtors' business and the

Chapter 11 Cases and to support the Debtors' applications and motions for "first day" relief

(collectively, the "First Day Motions").  Except as otherwise indicated herein, all facts set forth in

this declaration are based upon my personal knowledge of the Debtors' business, operations, sales,

and finances, information learned from my review of relevant documents, information supplied to

me by other members of the Debtors' management, consultation with the Debtors' professional

advisors, or my opinion based on my experience, knowledge, and information concerning the

Debtors' operations and financial condition.  I believe all information herein to be true, to the best

of my knowledge.  I am authorized to submit this declaration on behalf of the Debtors and, if called

upon to testify, I could and would testify competently to the facts set forth herein.

4.      To familiarize the Court with the Debtors, the Chapter 11 Cases, and the relief

sought in the First Day Motions, this declaration provides a summary overview of the Debtors and

the Chapter 11 Cases and is organized as follows:  Part I describes the Debtors' business

operations, corporate structure, key liabilities, and estate assets; Part II describes the events leading

up to the commencement of the Chapter 11 Cases; Part III summarizes the Debtors' goals in

commencing the Chapter 11 Cases; and <u>Part IV</u> sets forth the basis for my testimony regarding the facts underlying and described in the First Day Motions.

5.      As set forth in greater detail below, and as reflected in the First Day Motions, the Debtors have filed the Chapter 11 Cases to preserve and maximize the value of their assets for the benefit of their creditors and other stakeholders.

## I.      BACKGROUND REGARDING THE DEBTORS

### A.      Organizational Structure

6.      Benson Hill is a publicly traded company that has been traded on The Nasdaq Global Market under the symbol "BHIL" since August 26, 2024.  Prior to being traded on The Nasdaq Global Market, Benson Hill was traded on The New York Stock Exchange from September 30, 2021, to August 23, 2024.

7.      Benson Hill is the parent company and direct or indirect owner of Debtors Benson Hill Holdings, Inc. ("<u>Holdings</u>"), BHB Holdings, LLC ("<u>BHB</u>"), Benson Hill Seeds Holding, Inc. ("<u>Benson Hill Seeds Holding</u>"), Benson Hill Seeds, Inc. ("<u>Benson Hill Seeds</u>"), Benson Hill Fresh, LLC ("<u>Benson Hill Fresh</u>"), DDB Holdings, Inc. ("<u>DDBH</u>"), Benson Hill ND OldCo, Inc. ("<u>OldCo</u>"), and J&J Southern Farms, Inc. ("<u>J&J Southern Farms</u>" and together with Holdings, BHB, Benson Hill Seeds Holding, Benson Hill Seeds, Benson Hill Fresh, DDBH and OldCo, the "<u>Subsidiaries</u>").  A corporate organization chart is attached hereto as **Exhibit A**.

#### a. *2021 Merger*

8.      On September 29, 2021 (the "<u>Closing Date</u>"), Star Peak Corp II ("<u>STPC</u>"), a special purpose acquisition company, consummated a merger (the "<u>2021 Merger</u>") pursuant to that certain Agreement and Plan of Merger, dated May 8, 2021 (the "<u>Merger Agreement</u>"), by and among STPC, STPC Merger Sub Corp., a Delaware corporation and wholly owned subsidiary of STPC

("Merger Sub"), and Benson Hill, Inc., a Delaware corporation ("Legacy Benson Hill").  Pursuant to the terms of the Merger Agreement, a business combination between STPC and Legacy Benson Hill was affected through the 2021 Merger of Merger Sub with and into Legacy Benson Hill, with Legacy Benson Hill surviving the transaction as a wholly owned subsidiary of STPC.  On the Closing Date, STPC changed its name to Benson Hill, Inc. and Legacy Benson Hill changed its name to Benson Hill Holdings, Inc. (*i.e.*, Holdings).

### B.    Business Overview

9.    The Company is an ag-tech company on a mission to lead the pace of innovation in soy protein through differentiated and advantaged genetics.  Leveraging downstream insights and demand, the Company utilizes its CropOS® technology platform to design and deliver food and feed that's better from the beginning: more nutritious, and more functional, while enabling efficient production and delivering novel sustainability benefits to food and feed customers.

10.    By combining proprietary data with artificial intelligence capabilities, coupled with advances in plant genomics and its asset-light strategy, the Company believes it can accelerate the development and delivery of better food and feed options from the beginning—with a focus on both quantity and quality.  By leveraging deep insights on its proprietary soybean germplasm, Benson Hill is strategically positioned to drive seed innovation in broadacre opportunities for the aquaculture, pet food, swine, and poultry markets—some 90 percent of the soy market.  These steps allow for speed to market with solution-based products, allowing the Company to recommoditize soybeans for animal feed, food, and fuel.

#### a.  *Business Segments*

11.    The Company's business comprises one operating and reportable segment, Benson Hill, which combines seed innovation through its world-leading proprietary soy germplasm, the

4

CropOS® technology platform (described in more detail below) and its Crop Accelerator, an indoor year-round speed breeding and rapid prototyping facility.  The result is a complete and market-leading toolbox that will deliver seed innovations in the future.  The Company is currently developing a diversified seed portfolio spanning the following key markets—protein ingredients, aquaculture and specialty animal feed, and vegetable oils.  For each product, the Company's research and development efforts are focused on quality-centric traits, such as nutrient density, carbohydrate profiles, functionality, amino acid content, and sustainability, as well as yield potential and agronomic improvements.

12.    The Company maintains partnerships with farmers that are an essential part of its supply chain.  Within the traditional agriculture industry, farmers typically sell to elevators or processors who operate a high volume/low margin business to store commodity crops and convert them into largely aquaculture and specialty animal feed and industrial products.  Benson Hill's Ultra-High Protein, Non-GMO soybeans (one of its many offerings) have the potential to transform farmers' operations and increase the compositional productivity of soybeans.

### b.  The CropOS Platform

13.    The Company's CropOS® innovation engine is a proprietary, continuously learning and expanding product design and development platform that uses predictive breeding and other advanced tools like CRISPR gene editing technology to tap into the vast potential within the genome.  The Company is developing products leveraging the CropOS® platform through a three-step, iterative "Design, Build, Test" process that improves in precision and intelligence with each iteration.  The Company utilizes two key inputs to support this approach.  The first is an unparalleled data library comprising genotypic, phenotypic, and agronomic data, consumer insight data, and environmental data.  The second is a robust machine learning capability, which leverages

DMS_US.369022910.8

that data library to design prior to building.  This combination of relevant data and advanced simulation lets the Company get its products to market more efficiently, faster, and on timelines that can more effectively respond to evolving market needs.

14.     In the Design step, the CropOS® platform employs a diverse array of simulations and predictions to execute the most efficient and cost-effective path to novel product development. The platform can consider billions of data points in millions of pipeline configurations to identify the starting parental plant breeding combinations, predict gene targets, and analyze optimal farm management and environmental conditions.  These state-of-the-art platform capabilities and enabling technologies allow the Company to assess the probability of success early in the research and development process, focusing resources and avoiding potentially expensive late-stage failures.  In turn, this allows for a larger breadth of products to be designed.

15.     Once an optimal path is identified, the process enters the Build step.  In this stage of the development process, candidate products are created through predictive breeding and gene editing.  The Company's proprietary suite of gene editing technologies and intellectual property portfolio enable it to edit the plant's own genome predictably and precisely.  The Company can leverage its knowledge of plant gene functions to unlock and restore lost or muted genetic variation that is within the natural diversity of the plant or knock out genes that are unwanted.

16.     Through the Company's Crop Accelerator, opened in October 2021, in St. Louis, Missouri, the Build step of the process is sped up within the Company's controlled environment, indoor product development facility.  This 47,000-square-foot facility features dynamically adaptive Conviron® growth houses and chambers, equipped with sophisticated sensor and environmental controls, including multi-channel LEDs, imaging capabilities, additive carbon dioxide, and temperature, humidity, and lighting controls.  The Crop Accelerator enables rapid

6

testing and target candidate selection over multiple growth cycles.  Insights and data points gathered during each growing cycle further enhance the predictive capabilities of the CropOS® platform.  This cycle of feedback will accelerate the ability to develop new offerings, including continued expansion of the Company's proprietary portfolio of soybeans.

17.     After a potential commercial product is built, it then enters the Test step where it is evaluated within the Company's network (comprising internal and third-party sites and capabilities) of hundreds of field-level testing research and production sites.  These predictive optimization capabilities have the potential to maximize the return on the genetics by using proprietary placement models, which are built on environmental and performance data to predict where to contract acres to lift protein content.  The Company then uses digital agriculture technology to collect on-farm data through its grower data partnership program and other relationships to enhance the CropOS® platform.

### C.     Operations

18.     The Debtors are headquartered in St. Louis, Missouri, where most of their research and development activities are managed.  In February 2024, as part of the Company's transition to an asset-light business model (the "Business Transition"), the Company divested its soy-crushing and food-grade white flake and soy flour manufacturing operation in Creston, Iowa, which followed the October 2023 divestiture of its soy crushing facility in Seymour, Indiana, described in further detail below.  In February 2025, the Company divested its dry pea processing facility in Grand Forks, North Dakota.  At this time, the Company sells its products primarily in North America.

19.     Moving to an asset-light business model will enable the Company to focus on its research and development competitive advantage while participating across the value chain

through partnerships that are more efficient to scale acreage, require less operating expense and are more capital efficient. This model allows the Company to maintain its ability to solve end-user challenges with seed innovation. As the Company analyzes the asset-light business model across the value chain, it has identified three opportunities to monetize Benson Hill's technology: (1) by licensing its germplasm to seed companies; (2) through direct seed sales to farmers; and (3) through technology access fees and value-based royalties from seed companies, processors and end users. In the future, the Company plans to enter the animal feed market and secure partnerships and licensing agreements to scale its product offerings.

20.     The emergence of significant market headwinds in the food, aquaculture, and specialty oil markets was a factor in the decision to reshape the Company's business to best position its proprietary product portfolio and future product pipeline for significant growth. The latest field evaluations on the Company's third generation of Ultra High Protein Low Oligosaccharides, non-GMO soybean varieties showed protein gains of two percent over the previous generation and achieved a yield gap of only three to five bushels per acre, compared with commodity GMO soybeans. The Company's herbicide-tolerant Ultra High Protein ("UHP") soybean varieties are on track for commercial release in 2025, with acreage and further portfolio expansion expected in 2026. This is a major step in providing farmers with options for weed control and enabling lower-cost, broadacre production of already advantaged UHP soybeans for the animal feed industry.

### a. Business Transition

21.     On October 31, 2023, the Company announced plans to improve its financial position and accelerate the Business Transition and Liquidity Improvement Plan (defined below) with a focused expansion into broadacre animal feed markets, intended to complement its

accomplishments in human food ingredients.  Under this plan for the Business Transition, the Company intends to serve the animal feed market through an asset-light business model and secure partnership and licensing agreements to scale its product innovations.  In connection with this transition plan, the Company divested its soy processing assets and dry peas products business, the proceeds of which improved its liquidity position while it sought to secure partnership and licensing agreements to help it execute on its long-term strategy.

### b.  Sale of Facilities

22.    In connection with the execution of the Business Transition and Liquidity Improvement Plan, on October 31, 2023, the Company entered into an asset purchase agreement with White River Soy Processing, LLC ("White River"), pursuant to which, among other things, it sold its soybean processing facility located in Seymour, Indiana, together with certain related assets, for approximately $35.4 million of total gross proceeds, which included $25.9 million for the facility assets and the remainder for net working capital, subject to certain adjustments, including an adjustment for inventory (the "Seymour Sale").

23.    On February 13, 2024, the Company entered into a membership interest purchase agreement with an affiliate of White River, pursuant to which, among other things, the Company sold all of its interests in its wholly-owned subsidiary, Benson Hill Ingredients, LLC, for approximately $52.5 million, plus a working capital adjustment estimated to be approximately $19.5 million, subject to certain deferred payments, holdbacks and other adjustments (the "Creston Sale").

24.    The Creston Sale and the Seymour Sale (collectively, the "Facility Sales") represent the completion of an expected milestone as the Company implements cost and operational improvements as part of its expanded Liquidity Improvement Plan.  These actions align with

Benson Hill's commitment to disciplined liquidity management and asset efficiency as it completes the Business Transition backed by world-class soybean germplasm and competitively advantaged technology.  The Company used the proceeds from the Facility Sales to improve its liquidity position, by fully retiring its high-cost debt, and reducing its operating and working capital costs.

25.      The Facility Sales were executed to leverage the Company's core competencies as a technology-enabled seed innovation company as it completes the Business Transition with an expanded focus on animal feed markets.  Exiting the soybean processing business is intended to strengthen the Company's balance sheet as it seeks to continue to commercialize its core business and intellectual property assets through partnerships and licensing arrangements to scale its product innovations.  Following the Creston Sale, the Company exited the ownership and operation of soybean processing assets.

### c.    The DDB Transaction

26.      On February 12, 2025, Dakota Dry Bean, Inc. ("DDB" or "Seller") and Holdings[2] (as DDB's parent, and together with Seller, the "Seller Parties"), entered into an asset purchase agreement (the "APA") with Dakota Dry Bean, LLC ("Buyer"), pursuant to which, among other things, the Seller agreed to sell, and Buyer agreed to purchase, substantially all of the assets relating to DDB's pea products business (the "DDB Transaction") for approximately $23.2 million of total gross proceeds, subject to certain adjustments, including an adjustment for inventory and other working capital (the "Purchase Price").

---

[2]  Holdings is a party to the APA for the primary purpose of being subject to certain indemnification obligations and being bound by certain restrictive covenants.

27.     The DDB Transaction closed on February 12, 2025 (the "Closing"), at which time $2.4 million of the Purchase Price was paid by Buyer to the Seller, and $2.5 million of the Purchase Price (the "Holdback") was held back by Buyer.  The Holdback may be used by the Buyer to satisfy the Seller Parties' indemnification and purchase price adjustment obligations under the APA.  The Holdback, less any applicable amounts retained by Buyer under the terms of the APA or otherwise subject to an applicable unresolved claim, shall be paid to the Seller following the 15-month anniversary of the Closing.

28.     In addition, at Closing, pursuant to the terms of the APA, Buyer paid, on behalf of Seller (as a reduction to the proceeds actually received by Seller), all Indebtedness (as defined in the APA) of Seller other than certain Permitted Indebtedness (as defined in the APA) to First National Bank of Omaha ("FNBO"), of approximately $18.4 million, to pay off all outstanding principal, interest, fees, reserves for costs and expenses and other amounts owed by Seller to FNBO under an outstanding credit agreement entered into in April 2019 (and subsequently amended and restated in May 2024) between DDB and FNBO (the "Credit Agreement"),[3] other than certain surviving obligations as described in the APA.

29.     Following the Closing, DDB changed its name to Benson Hill ND OldCo, Inc. (*i.e.*, OldCo).

### d.  The Workforce

30.     Prior to the Petition Date, the Debtors' workforce consisted mainly of research associates and assistants, product development scientists, agricultural engineers, and general

---

[3] Holdings provided a limited guaranty on the Credit Agreement in the amount of $8,000 in obligations to secure DDB's obligations thereunder.  The Credit Agreement was paid down as part of the DDB Transaction and there are no amounts currently outstanding as of the Petition Date.

business and administrative support.  As of the Petition Date, the Debtors directly employ a total of 108 full-time employees (the "Employees").[4,5]

31.     None of the Employees are represented by unions or are party to a collective bargaining agreement.

32.     The Employees perform a variety of critical functions for the Debtors, and their knowledge, skills, and understanding of the Debtors' infrastructure, business operations, and vendor and customer relations are essential to the success of the Chapter 11 Cases.  Without the continued service and dedication of the Employees, it will be difficult, if not impossible, to operate the Debtors' business without an unexpected or inopportune interruption and to prosecute the Chapter 11 Cases in a manner that will maximize the value of the Debtors' estates.

**D.      Prepetition Indebtedness**

33.     With the satisfaction of the amounts owed to FNBO under the Credit Agreement, the Debtors have no outstanding secured debt obligations.

**E.      Principal Assets and Liabilities**

34.     The Debtors' most recent set of unaudited financial statements reflects assets with a book value totaling approximately $137,542,000.00 and liabilities totaling approximately $110,701,000.00 as of September 30, 2024.

35.     The Debtors' assets include, among other things, cash and cash equivalents, accounts receivable, inventory, deposits on purchased inventory, property and equipment, deferred tax assets, investments in subsidiaries, intercompany receivables, and intellectual property.  The

---

[4]     As part of a reduction-in-force, the Debtors are planning to terminate 37 Employees immediately following the Petition Date (the "Terminated Employees"), leaving the Debtors with 71 Employees going forward.

[5]     The Debtors occasionally utilize consultants and/or independent contractors (the "Supplemental Workforce") for project-specific or term-based roles.  The Supplemental Workforce is managed by each individual department and retained based on agreements within those departments.

Debtors' intellectual property includes 245 pending or issued patents, 18 U.S. trademarks, six pending U.S. trademark applications, 99 registered non-U.S. trademarks, five pending non-U.S. trademark applications, and various licenses.

36.     The Debtors' liabilities include primarily accounts payable and lease obligations.

## II.    **EVENTS LEADING TO THE FILING OF THE CHAPTER 11 CASES**

### A.    **Cash Conservation Efforts**

37.     On March 27, 2023, the Company's Board committed to a Liquidity Improvement Plan (the "Liquidity Improvement Plan") intended to improve liquidity by an estimated $65 million to $85 million by the end of 2024.  The Company executed the Liquidity Improvement Plan to create a more cost-efficient organization and enhance its capital structure to execute on its strategic priorities.  On October 31, 2023, the Company announced an expansion of the Liquidity Improvement Plan to include the Facility Sales in connection with the Business Transition.  Using the proceeds from the Seymour Sale, in November 2023, the Company repaid approximately half of the outstanding Convertible Notes Payable, and following the closing of the Creston Sale, the Company successfully retired its Convertible Notes Payable in full earlier than their maturity date.  Furthermore, as set forth above, using the proceeds of the DDB Transaction, the Debtors were able to satisfy all of the amounts owed to FNBO under the Credit Agreement.

38.     Unfortunately, although the efforts the Company engaged in as part of the Liquidity Improvement Plan and the Business Transition were successful in large part, those successes were not sufficient to fully address the Company's continued liquidity issues.  Given that, in the fourth quarter of 2024, the Company began exploring potential restructuring options with the assistance of our counsel, Faegre Drinker, and investment banker, Piper Sandler & Co ("Piper Sandler").

**B.**     **Prepetition Marketing Efforts**

39.     As part of the Business Transition and Liquidity Improvement Plan, on June 12, 2024, the Debtors retained Piper Sandler as an advisor to undertake an evaluation of strategic alternatives and assist the Company in addressing its debt and liquidity positions.

40.     Piper Sandler has been working closely with the Company and rendered investment banking advisory services to the Company in connection with the marketing and potential sale of substantially all of the Company's assets from the time it was engaged to the present.  As part of its initial efforts, Piper Sandler reached out to both strategic and financial investors to assess interest in a potential transaction including an investment in or sale of the Company.  During this part of the process, Piper Sandler contacted 26 strategic buyers and 25 financial buyers.  From that outreach, 5 strategic buyers and 3 financial buyers executed an NDA and received confidential information.  Ultimately, no offers were received during this initial phase from these parties for either an investment in or sale of the Company.

41.     Supplementing its earlier marketing efforts, in the beginning of February of this year, Piper Sandler began its targeted outreach process to identify a stalking horse bidder, with a bid deadline of February 28, 2025.  Piper Sandler reached out to 35 parties, of which 5 parties executed NDAs.  Those parties were provided access to a data room that includes information customary and relevant to a sale process such as this.  The Debtors ultimately received one bid from a potential stalking horse bidder; however, in the Debtors' business judgment, this bid did not present sufficient value for the Debtors to move forward with it.

**C.**     **Prepetition Restructuring Efforts**

42.     While the prepetition stalking horse efforts were ongoing, the Debtors instructed Piper Sandler to also pursue a process to obtain post-petition financing in an amount sufficient to

14

fund operations and estate administration over the course of the Chapter 11 Cases (the "DIP Financing"). To that end, Piper Sandler sought financing proposals from various capital sources within the Debtors' existing capital structure and from third parties.

43.     Piper Sandler contacted 17 parties aside from the DIP Lenders regarding the potential provision of DIP Financing. Piper Sandler also had discussions with potential stalking horse bidders regarding providing DIP Financing. Ultimately, these efforts resulted in a group of potential lenders—which group ultimately consisted of S2G Investments, LLC, Expedition Ag Holdings, LLC, Steve Kahn, and ProAgInvest, LLC (collectively, the "DIP Lenders")— submitting a proposed term sheet to provide post-petition financing the weekend of March 15.

44.     In the days leading up to the commencement of the Chapter 11 Cases, the Debtors and their advisors have engaged in good-faith, arm's-length negotiations with the DIP Lenders to address the Debtors' immediate liquidity constraints and funding needs for the Chapter 11 Cases. In connection therewith, the Debtors, with the assistance of their advisors, analyzed their cash needs to determine the liquidity levels necessary to maintain the Debtors' going-concern value in connection with the Chapter 11 Cases, and developed an initial weekly budget (the "Initial Budget") along with case milestones. The Initial Budget accounts for the Debtors' working capital requirements, chapter 11-related costs, and all expenditures for which the Debtors seek authority to pay pursuant to various First Day Motions, if approved by the Court.

45.     Following these negotiations, on March 19, 2025, the Debtors successfully reached an agreement with the DIP Lenders on the terms of an $11 million DIP Financing as set forth in the *DIP Facility Commitment Term Sheet* attached to the Debtors' DIP Motion (as defined below). If approved by the Court, the DIP Facility will provide the Debtors with immediate access of up to $3 million upon entry of the Interim DIP Order, and the remaining $8 million upon entry of the

Final DIP Order (in two draws of $4 million each), to continue paying its operating expenses and signal to its customers, vendors, and employees that operations will continue uninterrupted in the ordinary course during the Chapter 11 Cases.

## III. THE PURPOSE/OBJECTIVES OF THESE CHAPTER 11 CASES

46.     The Debtors intend to utilize these Chapter 11 Cases to conduct a post-petition marketing and sale process for the Debtors as a going concern.  The Debtors believe that seeking a sale transaction presents the best available option for the Debtors under the circumstances.

### A.     Financing Needs and Budgeting

47.     It is essential to the Debtors' administration that they have adequate funds to operate in the ordinary course in a manner that is sufficient to maintain the Debtors' going-concern value through, at least, any bid deadline the Court establishes in these Chapter 11 Cases.  In particular, I believe the Debtors' immediate and continuing access to cash is critical to (a) ensure that the Debtors have sufficient working capital to, among other things, continue their remaining business operations in the ordinary course by paying their remaining employees, vendors, landlord, and service providers, (b) enable the Debtors to honor their prepetition obligations under and in accordance with the proposed "first-day" relief if approved by the Court, and (c) satisfy administrative expenses of these Chapter 11 Cases.  I believe that the Initial DIP Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the Initial DIP Budget.  In addition, the Initial DIP Budget includes all expenditures for which the Debtors seek authority to pay pursuant to various First Day Motions, if approved by the Court.

48.     Without the DIP Facility, I believe the Debtors, their estates, and parties in interest would be immediately and irreparably harmed.  While the Debtors will have the ability to use their

16

cash reserves in connection with these Chapter 11 Cases, those reserves alone are insufficient to fund the costs of maintaining, administering, and preserving their business and maximizing the value of their assets, including through the proposed marketing and sale process. The Debtors have an acute need for the DIP Facility to, among other things, minimize the disruption of their business operations and preserve and maximize the value of the assets of the Debtors' estates to maximize the recovery to all creditors of the estates.

49.     The Debtors and their advisors actively negotiated the terms and provisions of the DIP Facility, in good faith, in an effort to reach the best available material terms given the circumstances surrounding these Chapter 11 Cases. After evaluation by the Debtors' Board and management, with the input of the Debtors' advisors, I believe that the terms of the DIP Facility and proposed adequate protection are competitive and the best that the Company could obtain under the circumstances. Additionally, the DIP Lenders are familiar with the Debtors, their business, and their capital structure. This familiarity has enabled the DIP Lenders to act more quickly and limit diligence risk, both of which are crucial in light of the Debtors' critical need for liquidity. In sum, the DIP Facility represents the Debtors' best available post-petition financing option.

50.     For the reasons set forth above, I believe the Debtors' entry into the DIP Facility is necessary to preserve the value of the Debtors' estates for the benefit of the Debtors' stakeholders and avoid irreparable harm.

IV.    **FIRST DAY MOTIONS**[6]

51.    In furtherance of their restructuring efforts, the Debtors have filed First Day Motions prior to filing this declaration, and respectfully request that the Court enter the proposed orders granting the relief requested in the First Day Motions.  I believe that the relief sought in each of the First Day Motions (a) is vital to the Debtors' transition to, and operation in, chapter 11 with minimal interruption or disruption to their business or loss of productivity or value, and (b) constitutes a critical element in maximizing value during these Chapter 11 Cases.

    A.    **Joint Administration of the Debtors' Chapter 11 Cases for Procedural Purposes Only is Warranted Under the Circumstances**

52.    Contemporaneously herewith, the Debtors have filed the *Debtors' Motion for Entry of an Order Authorizing the Joint Administration of the Debtors' Chapter 11 Cases for Procedural Purposes Only* ("Joint Admin Motion"), seeking joint administration of the Chapter 11 Cases and the consolidation thereof for procedural purposes only.  Joint administration is warranted in the Chapter 11 Cases because (i) the Debtors' financial affairs and business operations are closely related and (ii) joint administration will ease the administrative burden on the Court and other parties in interest.  Many, if not all, of the motions, applications, hearings, and orders that will arise in these Chapter 11 Cases will jointly affect all Debtors.  Joint administration will also permit the Clerk of the Court to utilize a single docket for the Chapter 11 Cases and the Debtors to combine notices to creditors and other parties in interest in the Debtors' respective cases.  Further, joint administration will permit counsel for all parties in interest to include all of the Debtors' Chapter 11 Cases in a single caption for the numerous documents that parties in interest are likely to file

---

[6]    Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to them in the First Day Motions, as applicable.

DMS_US.369022910.8

and serve in the Chapter 11 Cases.  Importantly, joint administration will also enable parties in interest in all of the Debtors' cases to stay apprised of the various matters before the Court.

53.    Joint administration will significantly reduce the volume of paper that otherwise would be filed with the Clerk of the Court, render the completion of various administrative tasks less costly, and provide for greater efficiencies.  Moreover, the relief requested by the Joint Admin Motion will also simplify supervision of the administrative aspects of these cases by the Office of the United States Trustee for the District of Delaware.

**B.    The Remaining First Day Motions Are Necessary to the Chapter 11 Cases**

54.    The remaining First Day Motions that the Debtors will request the Court hear at the "first day" hearing in these Chapter 11 Cases are as follows:

- ***Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Redact Certain Personally Identifiable Information for Individual Creditors, (II) Modifying the Requirement to File a List of Equity Security Holders of Benson Hill, Inc. and Modifying Notice Thereto, and (III) Granting Related Relief***

- ***Debtors' Motion for Entry of Interim and Final Order (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations; (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief***

- ***Debtors' Motion for Entry of Interim and Final Orders (I) Granting Authority to (A) Continue Using the Cash Management System, Business Forms, Books and Records, and Pay All Fees Related Thereto, (B) Implement Ordinary Course Changes to Cash Management System, Including Opening and Closing Accounts; (II) Granting Authority to Continue Intercompany Transactions and Granting Administrative Expense Status to Postpetition Intercompany Transactions; and (III) Granting Related Relief***

- ***Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Pre-Petition Employee Obligations, (B) Maintain and Continue Employee Benefit Programs and Pay Administrative Obligations Related Thereto; (II) Modifying the Automatic Stay with Respect to the Workers' Compensation Program; (III) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto; and (IV) Granting Related Relief***

19

- ***Application of Debtors for Entry of an Order (I) Approving the Retention and Appointment of Stretto, Inc. as the Claims and Noticing Agent to the Debtors, Effective as of the Petition Date, and (II) Granting Related Relief***

- ***Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services; (II) Deeming Utility Companies Adequately Assured of Future Payment; (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment; and (IV) Granting Related Relief***

- ***Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors and Service Providers, (B) Foreign Vendors, (C) Shippers and Warehousemen, and (D) Certain Vendors Entitled to Administrative Expense Status Pursuant to Sections 503(b)(9) of the Bankruptcy Code; (II) Authorizing the Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief***

- ***Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Their Insurance Coverage Entered Into Prepetition and Pay All Related Obligations and (B) Renew, Modify, Extend, or Purchase Insurance Coverage, (II) Maintain Their Surety Bond Program, (III) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto, and (IV) Granting Related Relief***

- ***Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Scheduling a Final Hearing and (IV) Granting Related Relief*** (the "DIP Motion")

55.    To the best of my knowledge, I believe that the facts set forth in the First Day Motions are true and correct.  If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

56.    Furthermore, as a result of my personal knowledge, information supplied to me by other members of the Debtors' management, and from my colleagues that perform services for the Debtors, from my review of relevant documents, and upon my opinion based upon my experience, discussions with the Debtors' advisors and knowledge of the Debtors' operations and financial condition, I believe the relief sought in the First Day Motions is necessary for the Debtors to

DMS_US.369022910.8

effectuate a smooth transition into chapter 11 bankruptcy and to avoid irreparable harm to their business and estates, and is in the best interests of the Debtors' estates, creditors, and other stakeholders.

## **CONCLUSION**

In furtherance of their chapter 11 efforts, for the reasons stated herein and in each of the First Day Motions, the Debtors respectfully request that the Court grant the relief requested in the First Day Motions.

Dated: March 20, 2025              */s/ Daniel Cosgrove*
                                          Daniel Cosgrove
                                          Interim Chief Executive Officer

21